STATE, Respondent, v. MILWAUKEE BRAVES, INC., and others, Appellants.

*June 9—July 27, 1966.*

700

701

702

706

708

710

For the appellants there were briefs by *Ray T. McCann* of Milwaukee, attorney; and *Willkie, Farr, Gallagher, Walton & Fitzgibbon* of New York, N. Y., attorneys for appellants other than Atlanta Braves, Inc., and *Louis F. Carroll, Bowie K. Kuhn, Louis L. Hoynes, Anthony J. Lynch,* and *Daniel W. Hildebrand,* all of New York, N. Y., of counsel; and *Winston, Strawn, Smith & Patterson* of Chicago, Illinois, attorneys for Atlanta Braves, Inc., and

*Earl A. Jinkinson, Edward J. Wendrow,* and *John W. Stack,* all of Chicago, Illinois, of counsel; and oral argument by *Mr. Jinkinson, Mr. McCann,* and *Mr. Kuhn.*

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, and *George F. Sieker,* assistant attorney general; *Robert P. Russell,* corporation counsel for Milwaukee county; *Willard S. Stafford* and *John A. Hansen,* both of Madison, special counsel for the state of Wisconsin; *Steven E. Keane* and *John P. Eppel,* both of Milwaukee, special assistant corporation counsel for Milwaukee county; and *Louis F. Oberdorfer* and *Max O. Truitt, Jr.,* both of Washington, D. C., special counsel for the state of Wisconsin, and oral argument by *Mr. La Follette, Mr. Stafford, Mr. Sieker,* and *Mr. Keane.*

FAIRCHILD, J.  It seems crystal clear that under today's structure of organized professional baseball, defendants and the members of the American League have complete power to control participation in major league baseball, and to control the number of teams and the location of their home games; that although the power is shared with the American League, defendants nevertheless have very substantial and effective power of control; that major league baseball, as now carried on, is a business in which large sums are invested, and substantial gains received by players and owners, and that many other business activities are generated by and dependent upon it; that all the continuous interaction which constitutes major league baseball, and which holds the interest and support of the public has for thirteen years reached into Wisconsin, but it now operates entirely outside this state; that defendants have, by agreement among themselves to transfer the Braves, terminated very substantial business activity in Wisconsin, and are totally and effectively preventing its resumption at the present time.  On their face, these facts support a conclusion that there is a combination or conspiracy in restraint of trade and commerce, declared illegal by the

first sentence of sec. 133.01, Stats., as well as a combination to monopolize trade, under the third sentence of the section.

The defense to a charge of violating that section appears to be grounded upon three principal contentions:

(1) Sec. 133.01, Stats., does not apply to this type of business;

(2) State regulation of the location of franchises and admission to the League would conflict with congressional policy and unreasonably burden interstate commerce;

(3) If the state has any power to proscribe a decision to transfer a franchise unless reasonably arrived at, the Braves' decision to move from Milwaukee and the concurrence of the other defendants were reasonably arrived at.

1. *Applicability of sec. 133.01, Stats.* It is the contention of defendants that the exhibition of major league baseball games is the supply of a service, not an article or commodity, and that sec. 133.01 prohibits only restraints of trade or commerce in articles or commodities. The claim is that the second sentence in the section restricts the meaning of the first and third sentences.

There are six sentences in sec. 133.01 (1), Stats., but only the first three need be considered in this context. The first sentence provides:

"Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal."

The second sentence, condensed, provides that every combination, etc., "intended to restrain or prevent competition in the supply or price of any article or commodity . . ." or which "shall in any manner control the price of any such article or commodity, fix the price thereof, limit or fix the amount or quantity thereof to be . . . sold in this state . . . is hereby declared an illegal restraint of trade."

The third sentence, condensed, provides that every party to any combination, etc., "herein declared unlawful or declared to be in restraint of trade, or who shall combine or conspire with any other person . . . to monopolize or attempt to monopolize any part of the trade or commerce in this state" shall forfeit for each such offense not less than $100 nor more than $5,000.

The language is open to the construction that the second sentence is a specific declaration that certain types of combination with respect to the supply or price of an *article* or *commodity* are illegal restraints of trade, but that the first sentence of sec. 133.01 (1), Stats., still embraces other types of restraint of trade not specifically enumerated or described. The third sentence, which imposes a forfeiture, is consistent with this construction, for it imposes a forfeiture on a party to a combination "herein declared unlawful" (first sentence) "or declared to be in restraint of trade" (second sentence). It also suggests broad rather than narrow construction of the section, by imposing a forfeiture on anyone who shall conspire to monopolize any part of the trade or commerce in this state.

The first sentence is identical with ch. 219, sec. 1, Laws of 1893. Sec. 2 of that act imposed a forfeiture for monopolizing or conspiring to monopolize trade or commerce and sec. 5 allowed recovery of damages. The act contained no provision limited to articles or commodities. In the Revised Statutes of 1898, secs. 1, 2, and 5 were combined into sec. 1747e. The second sentence of present sec. 133.01 (1) was inserted by amendment of sec. 1747e by ch. 458, Laws of 1921. There is even less reason for supposing that the second sentence was an exclusive definition of the restraint of trade declared illegal by the first sentence or of the type of monopolization proscribed by the third sentence than if it had been part of the statute when first enacted.

Sec. 133.21, Stats., contains language very similar to the second sentence of sec. 133.01 (1) and provides that

any corporation which shall enter into any combination so described, with respect to an article or commodity, shall have its charter canceled. The source of this section was ch. 357, Laws of 1897, later appearing as sec. 1791j–1791m, R. S. 1898. Defendants call our attention to an opinion of the attorney general, 1908 Op. Atty. Gen. 495, stating that a combination of insurance companies seeking to regulate commissions paid to agents did not violate sec. 1791j because an agent's services are not a commodity. No reference was made to sec. 1747e in that opinion.

This court, however, in 1914, pointed out that sec. 1747e, Stats., was taken from the Sherman Act and should receive the same interpretation as that which was placed in the federal act by the supreme court of the United States.[1]

Defendants call our attention to the defeat in 1949 of a bill to amend the second sentence of sec. 133.01 (1), Stats., by adding the words "or service." It appears that there had been a circuit court decision stating, as dictum, that sec. 133.01 (1) would not apply to contracts fixing the prices of personal services. Although the defeat of the bill is consistent with defendants' position, we conclude that the insertion of the second sentence in 1921 did not limit the broad language of the first or third sentences to the types of combination described in the second.

Defendants also contend that because of the policy of this court of construing sec. 133.01, Stats., consistently with constructions of the Sherman Act, as pronounced by the supreme court of the United States, we should read into our statute the anomalous exemption from the federal act which organized baseball uniquely enjoys. The history of the development of this exemption will be noted elsewhere. Because of such history we do not deem

[1] *Pulp Wood Co. v. Green Bay Paper & Fiber Co.* (1914), 157 Wis. 604, 625, 147 N. W. 1058. See *State v. Lewis and Leidersdorf Co.* (1930), 201 Wis. 543, 549, 230 N. W. 692.

the relevant decisions the type of construction of the meaning of the federal statute which ought to apply to our own.

2. *The power of the state to apply its antitrust law in this instance.* We are dealing with the very fabric of the organization of commercial baseball, the power over participation in this activity which results from the fact that there is an organization, and, in this particular instance, an exercise of such power to the detriment of a community. One of the difficulties in dealing logically with such matters arises from the fact that the leagues have evolved along with the growth of organized baseball and that major league baseball as we know it is inseparable from the existence of leagues, some degree of control over free competition among teams and players, and some limitation of the number and capability of the constituent teams.

For an interesting history of the hundred-year evolution of the "organization" of commercially exhibited baseball, see Report No. 2002, House of Representatives, 2d Session, 82d Congress, "Organized Baseball," resulting from hearings of the subcommittee on Study of Monopoly Power of the Committee on the Judiciary, May 27, 1952.

As part of its conclusion, the subcommittee said, at page 229:

"The subcommittee recognizes, however, that baseball is a unique industry. Of necessity, the several clubs in each league must act as partners as well as competitors. The history of baseball has demonstrated that cooperation in many of the details of the operation of the baseball business is essential to the maintenance of honest and vigorous competition on the playing field. For this reason organized baseball has adopted a system of rules and regulation that would be entirely inappropriate in an ordinary industry."

At least two courts have recognized the unique business character of organized professional sports and the

necessity for a league structure.[2] In *United States v. National Football League* [3] it was stated:

"Professional football is a unique type of business. Like other professional sports which are organized on a league basis it has problems which no other business has. The ordinary business makes every effort to sell as much of its product or services as it can. In the course of doing this it may and often does put many of its competitors out of business. The ordinary businessman is not troubled by the knowledge that he is doing so well that his competitors are being driven out of business.

"Professional teams in a league, however, must not compete too well with each other in a business way. On the playing field, of course, they must compete as hard as they can all the time. But it is not necessary and indeed it is unwise for all the teams to compete as hard as they can against each other in a business way. If all the teams should compete as hard as they can in a business way, the stronger teams would be likely to drive the weaker ones into financial failure. If this should happen not only would the weaker teams fail, but eventually the whole league, both the weaker and the stronger teams, would fail, because without a league no team can operate profitably." [4]

The state appears to argue that the existence of defendants' power to deprive a community of existing activity in major league baseball plus their exercise of such power with respect to a Wisconsin community is *per se* a violation of our law. The first paragraph of the conclusions of law of the circuit court appears to be in agreement with this contention.

The state argues, additionally, however, that even if monopoly power must be accepted as a concomitant of major league baseball, because of the necessity for league

---

[2] *United States v. National Football League* (D. C. Pa. 1953), 116 Fed. Supp. 319, 323; *American Football League v. National Football League* (D. C. Md. 1962), 205 Fed. Supp. 60, 62, affirmed (4th Cir. 1963), 323 Fed. (2d) 124. See also Professional Sports Act of 1965, Calendar No. 446, Report No. 462, page 12 (Exhibit No. 526).

[3] *Supra,* footnote 2.

[4] Ibid. at page 323.

organization, a monopoly has a legal duty to deal reasonably with those who desire to deal with it. The circuit court, as stated in the conclusions of law, agreed, and considered that the transfer of the Braves accompanied by refusal of the league to enfranchise a new Milwaukee team was an unreasonable exercise of monopoly power.

Thus, on this second theory, the circuit court may have recognized the practical necessity of the existence of monopoly power in the members of the major leagues, and have felt that the mere use of that power in depriving a community of major league baseball would not be a violation if the defendants reasonably determined that continued operation in the community would entail losses which would eventually destroy the member club. Evidently the court concluded that the Braves or some other team could have operated profitably in Milwaukee, and the decision to transfer the Braves to Atlanta without enfranchising a new Milwaukee team was an unreasonable one.

But whether unreasonableness of the decision must be or was sufficiently proved or not, or whether the exercise of defendants' power, and resulting destruction of business activity in this state would be enough to constitute a violation in any event, the question arises whether the state law can be applied, either because of the interstate character of the business of major league baseball, or because of such interstate character combined with the unique exemption which such business enjoys under the federal antitrust laws. Because our conclusion on this question disposes of the case, we assume, without deciding, that the findings and conclusions of the circuit court with respect to reasonableness can be sustained. The substantial injury to business activity within Wisconsin caused by the defendants' exercise of their monopoly power is clear, and we assume, at this point, that a violation of Wisconsin law has occurred if our law can be applied.

It is evident that the activity of major league baseball, spread through eight states in the National League and nine states and the District of Columbia in the American

League is interstate commerce. Any suggestion to the contrary in 1922 in the *Federal Baseball Case, infra,* has been effectively overruled in the subsequent decisions explaining the exemption enjoyed by organized baseball, hereinafter discussed, and those cases now make it clear that organized baseball is interstate commerce and Congress may therefore regulate it.

Not only are defendants engaged in interstate commerce which involves activity within Wisconsin, but enforcement of the antitrust policy of Wisconsin would directly affect defendants' operations outside the state as well.

Application of our law to the situation before us would, in essence, require the league to admit a new member club. Although the judgment contains a provision requiring the Braves to return, we view it as an optional alternative to the relief which is more consistent with the policy of an antitrust law, namely expansion in membership when major league baseball is to be extended into new territory. It would be inconsistent with the very policy of an antitrust law for Wisconsin to insist that the Braves be returned without expansion, because such an outcome would maintain the monopoly at the expense of Atlanta, or communities elsewhere which might seek to have a team. What the circuit court decision says, as we view it, is that as long as it is economically feasible for a major league team to have its home in Milwaukee, defendants must not use their monopoly power to deprive Milwaukee of a home team, but defendants were and still are free to choose whether the Braves should continue in Milwaukee or some new team should operate there.

Because of the nature of the competition within the league and the mechanics of game schedules, it is obvious that expansion in league membership would affect the activities of every defendant, at least to the extent of games between the new and old members at the home location of each, a change in number of games played, and other incidents of scheduling. It also appears that expansion requires a reallotment of available players

among all the teams, or some other means of supplying a new team or teams with a sufficient number of players of the requisite ability.

It is clear that in the absence of the antitrust feature of defendants' agreement to remove the Braves (*i.e.*, exercise of monopoly power and agreement in restraint of trade) the state would have no power to prevent or impede the removal of a business enterprise even though such removal injured the interest of the state in preserving business activity within its borders.[5]

The question to be decided under the commerce and supremacy clauses of the constitution of the United States is: Does the presence and exercise of monopoly power arising out of the nature of the organization of baseball permit the application of the state's policy in this instance?

The state may, ordinarily, protect the interests of its people by enforcing its antitrust act against persons doing business in interstate commerce, but then, ordinarily, the federal government has an antitrust policy like that of the state.[6] In the case of organized baseball, however, there is no applicable federal antitrust law. The history of judicial action and legislative inaction with respect to organized baseball at leasts suggests a federal policy of approval of the existing structure, and the question readily arises whether there is a conflict between state and federal policy, so that the state policy must yield.

We emphasize that we are dealing here with a decision by the league as to the number and identity of its members (since the real vice of defendants' decision to move the Braves to a different location is the refusal to admit to membership a team with its home in Milwaukee). And

[5] *Oklahoma v. Kansas Natural Gas Co.* (1911), 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716; *Pennsylvania v. West Virginia* (1923), 262 U. S. 553, 43 Sup. Ct. 658, 67 L. Ed. 1117; *Toomer v. Witsell* (1948), 334 U. S. 385, 68 Sup. Ct. 1156, 92 L. Ed. 1460; *Hood & Sons v. Du Mond* (1949), 336 U. S. 525, 69 Sup. Ct. 657, 93 L. Ed. 865.

[6] *State v. Allied Chemical & Dye Corp.* (1960), 9 Wis. (2d) 290, 295, 101 N. W. (2d) 133.

a decision by the league on such a matter is a necessary incident of existence as a league.

The baseball exemption from federal antitrust laws was initially determined in 1922 by the decision of the supreme court of the United States in *Federal Baseball Club v. National League.*[7] A league of eight clubs, known as the Federal League, had attempted to become a major league. A settlement of this "baseball war" was reached by agreement among all parties except one club in the new league. It brought suit against the major leagues and others, claiming treble damages because the settlement agreement allegedly violated the Sherman Act.

In an opinion by Mr. Justice HOLMES, the court held that exhibitions of baseball were purely state affairs, were not trade or commerce in the ordinarily accepted use of the words, and the interstate transportation of players was merely incidental.[8] This case, of course, involved an aspect of control over participation in major league baseball closely related to the one now before us.

Thirty-one years later the question again reached the supreme court of the United States in *Toolson v. New York Yankees.*[9] This and companion cases were treble-damage actions by players who alleged they were damaged by control of their freedom to participate as players. The short *per curiam* decision (from which two justices dissented) appears to treat *Federal Baseball* as a decision that Congress did not intend to include the business of baseball within the federal antitrust laws, to suggest that the court might not have reached the same decision in 1953 as it did in 1922, but to hold that because the business had developed for thirty years on the understanding

[7] (1922), 259 U. S. 200, 42 Sup. Ct. 465, 66 L. Ed. 898.

[8] See also *National League v. Federal Baseball Club* (1920), 269 Fed. Rep. 681, for the opinion of the court of appeals of the District of Columbia, affirmed and relied upon by the supreme court.

[9] (1953), 346 U. S. 356, 74 Sup. Ct. 78, 98 L. Ed. 64, affirming *Toolson v. New York Yankees* (D. C. Cal. 1951), 101 Fed. Supp. 93, *Toolson v. New York Yankees* (9th Cir. 1952), 200 Fed. (2d) 198, *Kowalski v. Chandler* (6th Cir. 1953), 202 Fed. (2d) 413, and *Corbett v. Chandler* (6th Cir. 1953), 202 Fed. (2d) 428

that it was exempt, any change should be left to Congress where legislation would have only prospective effect. The court also noted that Congress had had the ruling under consideration, but had not seen fit to legislate on the subject.

The court's view of the situation was made more explicit in two subsequent cases.

In *United States v. Shubert* [10] (applying the Sherman Act to the performance of legitimate stage attractions), the court said, at page 229:

"In *Toolson,* where the issue was the same as in *Federal Baseball,* the Court was confronted with a unique combination of circumstances. For over 30 years there had stood a decision of this Court specifically fixing the status of the baseball business under the antitrust laws and more particularly the validity of the so-called 'reserve clause.' During this period, in reliance on the *Federal Baseball* precedent, the baseball business had grown and developed. . . . And Congress, although it had actively considered the ruling, had not seen fit to reject it by amendatory legislation. Against this background, the Court in *Toolson* was asked to overrule *Federal Baseball* on the ground that it was out of step with subsequent decisions reflecting present-day concepts of interstate commerce. The Court, in view of the circumstances of the case, declined to do so. But neither did the Court necessarily reaffirm all that was said in *Federal Baseball.* Instead, '[w]ithout reexamination of the underlying issues,' the Court adhered to *Federal Baseball* 'so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.' 356 U. S., at 357. In short, *Toolson* was a narrow application of the rule of *stare decisis.*"

The baseball cases were also discussed in *Radovich v. National Football League:* [11]

"In *Toolson* we continued to hold the umbrella over baseball that was placed there some 31 years earlier by *Federal Baseball.* The Court did this because it was

[10] (1955), 348 U. S. 222, 75 Sup. Ct. 277, 99 L. Ed. 279.
[11] (1957), 352 U. S. 445, 77 Sup. Ct. 390, 1 L. Ed. (2d) 456.

concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity. Vast efforts had gone into the development and organization of baseball since that decision and enormous capital had been invested in reliance on its permanence. Congress had chosen to make no change. All this, combined with the flood of litigation that would follow its repudiation, the harassment that would ensue, and the retroactive effect of such a decision, led the Court to the practical result that it should sustain the unequivocal line of authority reaching over many years.

"The Court was careful to restrict *Toolson's* coverage to baseball, following the judgment of *Federal Baseball* only so far as it 'determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.' . . . . As long as the Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in those cases. . . .

"If this ruling is unrealistic, inconsistent, or illogical, it is sufficient to answer, aside from the distinctions between the businesses, that were we considering the question of baseball for the first time upon a clean slate we would have no doubts. But *Federal Baseball* held the business of baseball outside the scope of the Act. No other business claiming the coverage of those cases has such an adjudication. We, therefore, conclude that the orderly way to eliminate error or discrimination, if any there be, is by legislation and not by court decision. Congressional processes are more accommodative, affording the whole industry hearings and an opportunity to assist in the formulation of new legislation. The resulting product is therefore more likely to protect the industry and the public alike. The whole scope of congressional action would be known long in advance and effective dates for the legislation could be set in the future without the injustices of retroactivity and surprise which might follow court action. Of course, the doctrine of *Toolson* and *Federal Baseball* must yield to any congressional action and continues only at its sufferance. . . ." [12]

On July 16, 1965, a report from the Committee on the Judiciary (Senate) stated:

---

[12] Id. pages 450–452.

"The Congress has shown awareness of the problems created by the various decisions of the Supreme Court affecting organized professional team sports and has given consideration to their antitrust aspects for 14 years. In that time approximately 60 bills have been introduced dealing with the status of professional team sports under the antitrust laws. Some of these bills sought to remedy the anomaly under which baseball was held to be outside the antitrust laws while other professional sports were declared within those laws."[13]

Thus it appears that organized baseball enjoys, by reason of long continued reliance on *Federal Baseball* and the policy reasoning of the supreme court that any change should be brought about by legislation, with prospective effect only, an exemption from the federal antitrust laws which no other organized sport enjoys even where the structure and operation of the organization may be similar.

We venture to guess that this exemption does not cover every type of business activity to which a baseball club or league might be a party and does not protect clubs or leagues from application of the federal acts to activities which are not incidental to the maintenance of league structure,[14] but it does seem clear that the exemption at least covers the agreements and rules which provide for the structure of the organization and the decisions which are necessary steps in maintaining it. The type of decision involved in this case, in essence, whether to admit a new member in order to replace an existing member which desired to move to a new area, appears to be so much an incident of league operation as to fall within the exemption.

[13] Professional Sports Act of 1965, Calendar No. 446, Report No. 462, p. 6 (Exhibit No. 526).

[14] See *United States v. National Football League* (D. C. Pa. 1953), 116 Fed. Supp. 319, holding restrictions imposed by the National Football League on the sale of radio and television rights illegal; Report No. 2002, House of Representatives, 2d Session, 82d Congress, "Organized Baseball," pages 7, 230 (Exhibit No. 7).

If Congress were to provide expressly that these matters were, for the present, to be left free from state as well as federal control, no state would have the power to regulate, reexamine, or review, or find violation of its antitrust law in decisions made with respect to location or transfer of a franchise or with respect to admissions to membership.

But we do not have an express provision, and the question is whether such intent is to be implied under the circumstances.

One author has described the problem as follows:

". . . The problem is not identical with the ascertainment of the intent of Congress, as that phrase is commonly used in the construction of a given statute. Rather the Court is seeking consistency with the tendency manifested by the relevant action of Congress. Thus it seems fair to say the Court seeks consistency with the policy apparent in federal legislation, so far as the Court can ascertain that policy. The Court has to guess, and in guessing it is likely to conceive that its wisdom coincides with the wisdom of Congress. Where no relevant policy can be perceived, the will of Congress is nonexistent.

"In effect, then, this approach emphasizes the idea that state statutes, having a material relation to interstate commerce, are to fail if they do not fit into the federal legislative policy for such commerce. That scheme of things involves three familiar categories: (1) subjects which are to be free from all regulation, at least for the time being; (2) subjects which Congress has regulated directly or through its agencies; and (3) subjects which Congress desires to be left to the states, at least for the time being. . . ." [15]

The supreme court of the United States has said that:

". . . the silence of Congress, when it has authority to speak, may sometimes give rise to an implication as to the Congressional purpose" but "The nature and extent of that implication depend upon the nature of the Congressional power and the effect of its exercise."

[15] Ribble, State and National Power Over Commerce, Columbia University Press (1937), p. 212.

The court explained further, in a footnote:

"The failure of Congress to regulate interstate commerce has generally been taken to signify a Congressional purpose to leave undisturbed the authority of the states to make regulations affecting the commerce in matters of peculiarly local concern, but to withhold from them authority to make regulations affecting those phases of it which, because of the need of a national uniformity, demand that their regulation, if any, be prescribed by a single authority [citing cases]." [16]

The court has also said that while various tests may be used for guidance as to the regulatory power left to the states where Congress is silent, the ultimate question is whether the state action conflicts with national policy:

"Certain first principles are no longer in doubt. Whether as inference from congressional silence, or as a negative implication from the grant of power itself, when Congress has not specifically acted we have accepted the *Cooley* case's broad delineation of the areas of state and national power over interstate commerce. *Cooley v. Port Wardens*, 12 How. 299; *Southern Pacific Co. v. Arizona*, 325 U. S. 761, 768. See Ribble, *State and National Power Over Commerce*, ch. 10. Absent congressional action, the familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, state action is struck down. If the activity is one of predominantly local interest, state action is sustained. More accurately, the question is whether the state interest is outweighed by a national interest in the unhampered operation of interstate commerce.

"There is no longer any question that Congress can redefine the areas of local and national predominance, *Prudential Insurance Co. v. Benjamin*, 328 U. S. 408; *Southern Pacific Co. v. Arizona, supra,* at 769, despite theoretical inconsistency with the rationale of the Commerce Clause as a limitation in its own right. The words of the Clause—a grant of power—admit of no other result. When Congress enters the field by legislation, we

[16] *Graves v. New York ex rel. O'Keefe* (1939), 306 U. S. 466, 479, 59 Sup. Ct. 595, 83 L. Ed. 927.

try to discover to what extent it intended to exercise its power of redefinition; here we are closer to an intent that can be demonstrated with assurance, although we may employ presumptions grounded in experience in doubtful cases.

"But whether Congress has or has not expressed itself, the fundamental inquiry, broadly stated, is the same: does the state action conflict with national policy? The *Cooley* rule and its later application, *Southern Pacific Co. v. Arizona, supra,* the question of congressional 'occupation of the field,' and the search for conflict in the very terms of state and federal statutes are but three separate particularizations of this initial principle." [17]

The situation which confronts us is not one where Congress has been silent as to a particular type of regulation in a broad field of interstate commerce, where the proposition may readily be implied that although no need

---

[17] *California v. Zook* (1949), 336 U. S. 725, 728, 729, 69 Sup. Ct. 841, 93 L. Ed. 1005. See also *Southern Pacific Co. v. Arizona* (1945), 325 U. S. 761, 767, 768, 65 Sup. Ct. 1515, 89 L. Ed. 1915, wherein it is stated: "But ever since *Gibbons v. Ogden* . . . the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority. . . . *Whether or not this long-recognized distribution of power between the national and the state governments is predicated upon the implications of the commerce clause itself, . . . or upon the presumed intention of Congress, where Congress has not spoken, . . . the result is the same."* (Emphasis added) ; Flynn, Federalism and State Antitrust Regulation (1964 Michigan Legal Publications), wherein the author states on page 199: "What is being suggested therefore is that in the area of concurrent state and federal jurisdiction, state antitrust laws should only be exempted or suspended from operation to the extent that federal antitrust laws are precluded from operation by federal regulatory legislation and antitrust exemptions. To permit application of state antitrust policy where federal antitrust policy is forbidden to tread, would defeat, obstruct, and frustrate the congressional scheme of regulation or defeat a national policy enunciated by an exemption from the federal antitrust laws." Also, Dowling, Interstate Commerce and State Power, 27 Virginia Law Review (1940), 1.

has been found for federal regulation, state regulation of local aspects may be quite appropriate. Rather, here, Congress has remained silent as to regulation of a particular industry, either by imposition of antitrust laws or otherwise, in the face of and seemingly in response to a series of judicial decisions which uniquely and emphatically pose the question to Congress of whether there shall be regulation in antitrust terms or otherwise. This industry has been organized for many years with a structure of which monopoly and restraint of trade are characteristics. The decisions suggest the probability, if not certainty, that the operations of organized baseball are rife with violation of the Sherman Act if it were to be applied, decline to apply the act because of the investment which has been made in reliance upon the belief that the act does not apply and, because of the havoc that retrospective application of the act would cause, call upon Congress to enact whatever regulation for the future it deems wise.

Reports of committees of both houses already referred to [18] show that substantial attention has been given to the question. The fact that Congress will, when motivated, act in response to judicial concern over organized professional sports is shown by its action following a federal court decision holding that certain television practices of the National Football League violated federal antitrust laws.[19] Congress enacted a statute which permits the member clubs of a league in the organized team sports to pool their individual television rights for sale by the league as a package.[20]

---

[18] Report No. 2002, House of Representatives, 2d Session, 82d Congress, "Organized Baseball;" Professional Sports Act of 1965, Calendar No. 446, Report No. 462, page 6 (Exhibit No. 526).

[19] *United States v. National Football League* (D. C. Pa. 1953), 116 Fed. Supp. 319 and (D. C. Pa. 1961), 196 Fed. Supp. 445 (construction of final judgment).

[20] Public Law 87–331, Sept. 30, 1961, 75 Stat. 732; 15 USCA, Secs. 1291–1295; H. R. 9096, 87th Congress, U. S. Code Congressional and Administrative News (1961), page 3042.

It is plausibly argued that silence of Congress in this context demonstrates congressional recognition that league structure and the related agreements and rules are integral parts of professional baseball as it exists, and that the application of the familiar type of antitrust legislation to the structural arrangements of organized baseball is inappropriate; that the control of the various elements of the structure which would otherwise involve prohibited monopoly or agreement in restraint of trade or commerce is, for the present, to be left completely to those who have that authority under the agreements and rules which cement the structure; that there is to be self-regulation until such time as Congress decides that the public interest requires other control.

Some members of this court, including the writer of this opinion, conclude that the silence of Congress in this context sufficiently implies such policy, and that application and enforcement of a state antitrust law to decisions of the league as to the location of franchises and membership in the league would conflict with the national policy in this segment of interstate commerce. We deem it unrealistic to interpret these decisions of the supreme court of the United States plus the silence of Congress as creating a mere vacuum in national policy, leaving the states free to regulate the membership of the baseball leagues.

Other members of the court prefer the view that the structure of the leagues, their decisions as to their own membership, location of franchises, and things of that nature, require uniformity of regulation, and since organized baseball operates widely in interstate commerce, the regulation, if there is to be any, must be prescribed by Congress.[21]

As already pointed out, the operations of each league cover a number of states. Wisconsin is presently concerned over the problem created by removal of a team

[21] *Graves v. New York ex rel. O'Keefe, supra,* footnote 16.

from one of its communities. Other states (Washington, for example, or Georgia if the Braves had not moved there) have no major league baseball activity but have an interest in the granting of a franchise in some presumably eligible community within them. Texas, one of whose communities has a team, and is therefore not faced with a serious problem of obtaining personal jurisdiction, has an apparent interest in a favorable decision on application by a club in another of its communities. There may well be a limit to the number of teams which can feasibly be included in a major league, and the answer to this question involves the exercise of discretion. There could be an applicant in a community which is economically incapable of supporting a team, and economic feasibility is another issue to be decided. There may well be thought to be a national interest in a wider distribution of available franchises throughout the country, but it may be doubted that a state will be objective in deciding whether that is an appropriate consideration, nor what the answer should be in a given case. If Wisconsin can reach her problem by application of her antitrust statute, other states would have equal standing to apply other types of regulatory rules and procedures, involving differing standards for decision. We have already observed that the regulations of league membership imposed by any state necessarily affect activities of members in other states.

It is true that the suggested confusion of state regulation does not appear presently to be a fact,[22] but those who adhere to this view consider that variance in the local interests, and the standards which would be applied, and the impact of a state's action on activities outside its borders are sufficient that we should not read into the silence of Congress permission for the individual states to regulate these matters.

[22] Cf. *Huron Cement Co. v. Detroit* (1960), 362 U. S. 440, 448, 80 Sup. Ct. 813, 4 L. Ed. (2d) 852.

A majority of this court (though not in complete agreement as to which of the two theories just stated is controlling), conclude that the Wisconsin antitrust statute cannot, because of requirements of the federal constitution, be applied to concerted action by the defendants in moving the Braves from Milwaukee and refusing applications by others for a franchise.

Accordingly the judgment will be reversed and the complaint dismissed.

We must observe, however, that the record in this case emphasizes the existence of a problem, even though the state is powerless to deal with it. The record strongly suggests that the defendants gave little heed to the interests of the Milwaukee community, and to the injury which the move would cause. There ought, we think, to be included in any law which Congress may pass upon this subject some provision which would protect communities, either those who have or hope to have home teams, from arbitrary and unfair dealing.

*By the Court.*—Judgment reversed, cause remanded with directions to dismiss the complaint.

HEFFERNAN, HALLOWS, and BEILFUSS, JJ. (*dissenting*). We respectfully dissent from the opinion of the majority and conclude there is neither federal preemption of the Wisconsin law nor is the remedy sought by the state of Wisconsin in this action of a nature that the enforcement of the trial court's order will burden interstate commerce in the sense proscribed by the constitution. The majority opinion admits that the operations of baseball complained of clearly violate the well established standards of business behavior prescribed by Wisconsin antitrust statutes. Moreover, the majority opinion specifically subscribes to the trial court's findings that these specific violations of law by organized baseball have caused substantial injury to business activity in Wisconsin.

We are thus confronted with activities carried on by a business enterprise that, in the absence of some im-

munity, are clearly unlawful. The majority finds that there is such immunity and, alternatively, bases that conclusion upon two reasons: (1) That the silence of Congress evinces a congressional policy that baseball shall be free of all control, state as well as federal; and (2) that any state regulation of baseball is *ipso facto* a burden on interstate commerce, since, by its nature, professional baseball is an area of commerce that can be controlled, if at all, only by uniform rules that in a practical sense can be promulgated by Congress alone. It is noteworthy that the opinion of the majority does not reflect unanimity of its reasons but only the result.

The argument of the majority is that the failure of the Congress to act in the face of the importunings of the United States supreme court is equivalent to a positive declaration of congressional will that baseball should not only be unregulated federally but should also be free of state control. The acceptance of federal preemption under the circumstances of this case appears to be contrary to the past pronouncements of this court. In the recent case of *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. (2d) 505, 512, 135 N. W. (2d) 269, we restated the rule which this court has long followed and which follows the decisions of the United States supreme court on the subject—that "before pre-emption will be found to exist, that intention of Congress must be clearly manifested."

In *Welch Co. v. New Hampshire* (1939), 306 U. S. 79, 85, 59 Sup. Ct. 438, 83 L. Ed. 500, the United States supreme court stated:

" 'In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution . . . it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested.' "

That being the standard where specific legislation is involved, can there be a less rigorous criterion for the preemption of state police power where our only clue to congressional intent is nonaction? Can we conclude that congressional silence amounts to a manifestation that it is the national policy and the congressional will that baseball be free of *all* regulation? We think not.[1] The majority opinion subscribes to the view "that the silence of Congress in this context sufficiently amounts to an expression of such policy." No authority is quoted for this proposition, nor does a review of the briefs of the appellants reveal the citation of any prior adjudications which hold that we may predicate a policy of preemption upon silence. The most that possibly can be concluded from the failure of Congress to enact some regulation of baseball is that it reveals a congressional complacency with its own policy of nonaction and inertia. Even that is a strained interpretation since the record shows that there have been several unsuccessful attempts to enact congressional regulation which would clarify the attitude of Congress toward the regulation of organized baseball.

The supreme court of the United States in *Federal Baseball Club v. National League* (1922), 259 U. S. 200, 42 Sup. Ct. 465, 66 L. Ed. 898, held that baseball was not in interstate commerce and, therefore, not subject to the federal antitrust laws. Subsequent decisions make it abundantly clear that the rationale of *Federal Baseball* is invalid and that, in fact, baseball is in interstate commerce. However, the United States supreme court, relying upon *stare decisis,* has continued to extend the umbrella of protection from *federal* antitrust legislation over the baseball business. Congressional inaction can be construed as acquiescence in the court's interpretation,

[1] See *Federal Trade Comm. v. Dean Foods Co.* (1966), 384 U. S. 597, 86 Sup. Ct. 1738, 16 L. Ed. (2d) 802; *Helvering v. Hallock* (1940), 309 U. S. 106, 119–121, 60 Sup. Ct. 444, 84 L. Ed. 604.

but this in no way constitutes an expression of intent that Congress shall exclusively occupy the field or that there shall be no control whatsoever. As was pointed out in *Graves v. New York ex rel. O'Keefe* (1939), 306 U. S. 466, footnote 1, 479, 59 Sup. Ct. 595, 83 L. Ed. 927:

"The failure of Congress to regulate interstate commerce has generally been taken to signify a Congressional purpose to leave undisturbed the authority of the states to make regulations affecting the commerce in matters of peculiarly local concern, but to withhold from them authority to make regulations affecting those phases of it which, because of the need of a national uniformity, demand that their regulation, if any, be prescribed by a single authority."

The majority opinion, moreover, hypothesizes a conflict between state and federal legislation where none exists in fact. In *Huron Cement Co. v. Detroit* (1960), 362 U. S. 440, 443, 80 Sup. Ct. 813, 4 L. Ed. (2d) 852, the court said:

" 'The intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State.' "

The United States supreme court in the same case referred to its "teaching . . . which enjoin seeking out conflicts between state and federal regulation where none clearly exists." *Huron Cement Co. v. Detroit, supra,* page 446.

The majority opinion by construing the silence of Congress as conflicting with the state's policy as expressed in its antitrust laws appears to disregard this admonition.

It seems clear that the proposition that the majority asserts is a novel one without prior foundation in con-

stitutional law and is an express repudiation of the doctrine that there shall be preemption or a superseding of state regulations only by express legislation.

A more difficult problem is presented by the second facet or alternate basis of the majority's opinion. The majority states the proposition, "that the structure of the leagues, their decisions as to their own membership, location of franchises, and things of that nature, require uniformity of regulation, and since organized baseball operates widely in interstate commerce, the regulation, if there is to be any, must be prescribed by Congress." It is generally stated:

"Absent congressional action, the familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, state action is struck down. If the activity is one of predominantly local interest, state action is sustained. More accurately, the question is whether the state interest is outweighed by a national interest in the unhampered operation of interstate commerce." *California v. Zook* (1949), 336 U. S. 725, 728, 69 Sup. Ct. 841, 93 L. Ed. 1005.

This argument partakes of the theory that irrespective of congressional action or inaction, there is a certain sphere of interstate commerce within which a state may not operate at all. This area is one in which congressional intent is immaterial. Our federal system envisages the free flow of commerce, in the various meanings of that phrase, from one state to another unhampered by state action. Hence, if our federal political union is to thrive, certain aspects of interstate commerce cannot be interfered with, irrespective of congressional will or the claims of state police power. The majority opinion, as an alternative to the argument based on the manifestation of congressional will, follows this line of reasoning. The majority's approach, however, overlooks the recognized necessity of balancing national interest versus

local interest as such interests are juxtaposed in a given situation. As the United States supreme court pointed out in *California v. Thompson* (1941), 313 U. S. 109, 113, 61 Sup. Ct. 930, 85 L. Ed. 1219:

"The Commerce Clause, in conferring on Congress power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress has not exercised its power, even though the regulation affects interstate commerce."

That case cites numerous instances where the United States supreme court has upheld the exercise of state police power which clearly regulated some phase of interstate commerce. In the same opinion, the United States supreme court, speaking through Mr. Justice STONE, stated:

"It has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court, subject only to other applicable constitutional restraints." *California v. Thompson, supra,* page 113.

The court concluded its discussion upholding a California police regulation by stating:

"In any case, until Congress undertakes its regulation, we can find no adequate basis for saying that the Constitution, interpreted as a working instrument of government, has foreclosed regulation . . . by local authority."

The majority opinion points out the cavalier disregard of either law or reasonableness in the exercise of the baseball monopoly. We cannot conclude that the state is less able to resist this treatment of its legitimate interests by organized baseball than it is to prevent the entrance into its boundaries of contagious disease, although such disease is carried in interstate commerce. *Morgan's Steamship Co. v. Louisiana* (1886), 118 U. S. 455, 6 Sup. Ct. 1114, 30 L. Ed. 237; *Compagnie Francaise v. Board of Health* (1902), 186 U. S. 380, 22 Sup. Ct. 811, 46 L. Ed. 1209. The record, as the majority indicates, strongly suggests that the defendant gave little heed to the Milwaukee community and to the injury which the move of the Braves out of Wisconsin would cause. Organized baseball is engaged in a boycott of Wisconsin business. The argument is posed that, although this injury be admitted, for the state of Wisconsin by its decree either to order the Braves team to stay here or to direct the National League to furnish an expansion team would burden interstate commerce, which, if it is to be burdened at all, can be done uniformly only by congressional action. It appears, however, that in view of the particular circumstances of this case, the paramount interest in regulating baseball is a Wisconsin interest, not a national interest. As stated in *California v. Thompson, supra*, page 115:

"Fraudulent or unconscionable conduct of those so engaged which is injurious to their patrons, is peculiarly a subject of local concern and the appropriate subject of local regulation."

The National League and the Milwaukee Braves, Inc., saw fit to come within the jurisdiction of the Wisconsin courts, and for thirteen years continued to play its home games in Milwaukee. It is not contradicted that as a result of the Braves' presence in Wisconsin, transportation facilities were expanded, municipal services were augmented, and industries of various types were created

or expanded to support organized baseball in Milwaukee. The record shows, and the findings of the court are not disputed by the majority, that the National League baseball team was a profitable enterprise during the time that it was located in Wisconsin. Admitting that the order of the trial court to either return the Braves to Milwaukee or, in the alternative, have the National League furnish an expansion team within a reasonable length of time is to prevent a boycott of Wisconsin commerce, does that factor *ipso facto* constitute a burden on interstate commerce?

We think not. It is well settled that a state may exercise its police powers through such devices as the antitrust laws even though an incidental benefit may be to local commerce, providing that the law or its operation do not discriminate against interstate commerce or disrupt its required uniformity. *Huron Cement Co. v. Detroit* (1960), 362 U. S. 440, 448, 80 Sup. Ct. 813, 4 L. Ed. (2d) 852; *Head v. New Mexico Board* (1963), 374 U. S. 424, 83 Sup. Ct. 1759, 10 L. Ed. (2d) 983; *Cooley v. Board of Wardens* (1851), 53 U. S. (12 How.) 299, 13 L. Ed. 996. There is no intimation by the appellant that the Wisconsin antitrust laws are applied in a discriminatory manner. It is equally clear that state antitrust laws can be enforced concurrently with, or in the absence of, federal regulation. *Watson v. Buck* (1941), 313 U. S. 387, 403, 61 Sup. Ct. 962, 85 L. Ed. 1416; The Commerce Clause and State Antitrust Regulation, 61 Columbia Law Review (1961), p. 1469. Here, the Wisconsin antitrust laws concededly are being applied in exactly the same fashion that they would be applied to a wholly domestic corporation.

Clearly, the order of the trial court imposes some restrictions upon baseball's conduct in interstate commerce, but this dissenting opinion concludes that the valid interests of the state of Wisconsin, which are entitled to protection, outweigh the restrictive effect on interstate commerce that might result from the enforcement

of Wisconsin's laws. Under such circumstances, the preemption argument or overriding-national-interest argument should be rejected and the state law sustained. See Constitutional Law, West Publishing Company (1963), 310, 319, reprinting Pre-emption as a Preferential Ground: A New Canon of Construction, 12 Stanford Law Review (1959), 208.

The violation of Wisconsin's antitrust laws is apparent and the wrong that has been done to Wisconsin and its citizens is substantial. As the trial court determined in its findings, the unbridled exercise of monopoly by the Braves baseball team will deprive the public and various businesses located in Milwaukee of substantial economic and recreational benefits,[2] and as the court concluded as a matter of law the conduct of the Braves ball club constitutes a violation of Wisconsin's antitrust statutes. The majority in arriving at its conclusion concede the antitrust violation, if the application of the statute is not otherwise barred.

The trial court's order directs that these wrongs shall be rectified by providing, in the alternative, that the baseball team shall either return to Milwaukee or that an expansion team be furnished by the league.

This would not appear to be an onerous burden upon baseball. The direction is merely to return to Milwaukee, where operations have been profitable and where, as a matter of fact, the trial court has found that continued profitable operations are feasible. The trial court also found, as a matter of fact, that expansion of the league is feasible. What the trial court has directed is not the curtailment or burdening of interstate commerce, but its emancipation from the monopolistic practices of baseball. It has directed that baseball, in its dealings with a community where it has prospered for thirteen years, act reasonably. All that is prohibited is the

---

[2] One witness testified that the annual economic benefit to Milwaukee amounted to $18,000,000.

*unreasonable* use of monopoly power. It can hardly be argued that it is in the national interest to preserve a monopoly that may with impunity flout the laws of the state of Wisconsin and injure its citizens and economy. The appellant argues that the affirmance of the trial court's ruling will undermine the very essence of organized baseball. It may well be that baseball as presently operated, above the law, should in some respects be modified, but we conclude that organized baseball underestimates the viability of the national pastime and exaggerates the potential state control that can emanate from an affirmance of the trial court's order. Only in the unique case, as the facts reveal here, where a baseball club in collusion with others unreasonably determines to boycott *in toto* an area previously served would the relief sought by the state of Wisconsin be possible. It is not contended that an antitrust or other regulatory action could be brought where there had not been a prior offering of regular baseball exhibitions.

We are not convinced that for baseball to be successful it must be unlawful. Admittedly, the judgment of the Braves' management (whose wisdom was severely challenged in the course of trial) to leave Milwaukee or for the league to totally abandon the area would be superseded by the affirmance of the order of the trial court. This, however, is a usual result where relief is sought under an antitrust statute. Management decisions are superseded if the compelling public interest so requires. The balance that must be struck in determining whether a state policy burdens interstate commerce is not dependent upon the effect it may have upon the particular item of commerce, but rather upon its impact on the national interest in preserving that commerce in its unregulated form.[3] It is difficult to see that any national interest is served by preserving a flow of commerce that at will

[3] *Parker v. Brown* (1943), 317 U. S. 341, 362, 63 Sup. Ct. 307, 87 L. Ed. 315.

violates the laws of one of the states and the legitimate interests of its citizens.

The fact that Congress has not acted would appear to be persuasive reason for the state to act. As pointed out in *Parker v. Brown* (1943), 317 U. S. 341, 362, 63 Sup. Ct. 307, 87 L. Ed. 315, state regulations of interstate commerce are to be upheld "because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character, and the practical difficulties involved, *may never be adequately dealt with by Congress.*" (Emphasis supplied.)

Baseball has heretofore successfully evaded all control. In *Federal Baseball, supra,* it contended, and successfully persuaded the United States supreme court, that it was purely in intrastate commerce and therefore immune from federal regulation. By a process of legal ossification it manages to preserve this immunity, while at the same time it asserts that it is in interstate commerce and therefore immune from state control. We are unwilling to ascribe to our legal system the impotency that the representatives of baseball would confer upon it.

The record shows that the Braves organization is no innocent. that has unexpectedly run afoul of an unreasonable state's efforts to preserve its share of a monopoly. The record is rife with evidence that the corporation acted surreptitiously and deceitfully in an effort to prevent a timely exercise of Wisconsin's jurisdiction. The officers of the club represented that no change in location was contemplated when, in fact, the negotiations for that change were substantially complete. The contract with Atlanta contained an exculpatory clause allowing the team to terminate its contract with Atlanta if litigation should force it to remain in Milwaukee. It is apparent that the baseball club contemplated the likelihood

of being called to task for its conduct. The defendants have not sustained the burden of showing that Wisconsin's reasonable enforcement of its antitrust law constituted a prohibited burden upon interstate commerce.

It is difficult to see what national interest is preserved by immunizing this organization from the consequences of its violation of state law. Where, as here, the Congress has failed to act to protect the states from monopolistic predators, it is apparent that in the balance the salutary effect of law enforcement upon local welfare outweighs any spurious national interest that allegedly exists in preserving an unlawful interstate conspiracy that claims freedom from all legal restraints and sanctions.

We would affirm.