LIBERTARIAN PARTY OF WISCONSIN, Libertarian Party of Metropolitan Milwaukee, Fritz Beck, Robert Collison, Bryan Harwood, Richard Luedtke, Jeffrey H. Marker, Todd M. Mascaretti, Barbara Pokrandt, Cory Schultka and James Varley, Petitioners.

v.

STATE of Wisconsin, Tommy G. Thompson, Governor, James R. Klauser, Secretary of Administration, Mark D. Bugher, Secretary of Revenue, Fritz Ruf, Executive Director, Wisconsin Housing and Economic Development Authority, F. Thomas Ament, County Executive, County of Milwaukee, John O. Norquist, Mayor, City of Milwaukee, Southeast Wisconsin Professional Baseball Park District, A Special District Created Under Section 229.66, Stats., Robert Trunzo, Chairperson of the Board of that District, Steve Agostini, Lorraine Blaubach, Frank Busalacchi, Frederick Gierach, Elaine Kraut, Mickey Lehman, Craig Leipold, Karen Makoutz, Ulice Payne, Jr., Douglas Stansil, Members of the Board of that District and Milwaukee Brewers Baseball Club, a Wisconsin Limited Partnership, Respondents.

Supreme Court

*No. 95–3114–OA. Oral argument January 11, 1996.—Decided April 9, 1996.*

(Also reported in 546 N.W.2d 424.)

*See Callaghan's Wisconsin Digest, same topic and section number.

For the Petitioners there were briefs by *Gaar W. Steiner, Douglas H. Bartley, Patricia S. Matusiak* and *Steiner & Schoenfeld*, Milwaukee and oral argument by *Douglas H. Bartley*.

For the respondents there was a joint brief by *F. Thomas Creeron, III*, assistant attorney general and *James E. Doyle*, attorney general; *James T. McClutchy, Jr.*, deputy corporation counsel and *Robert G. Ott,* corporation counsel; *Patrick B. McDonnell*, special deputy city attorney and *Grant F. Langley*, Milwaukee city attorney; *Jon P. Axelrod, William E. McCardell, Joseph A. Ranney* and *DeWitt Ross & Stevens, S.C.*, Madison; and *Thomas L. Shriner, Jr., Richard M. Esenberg* and *Foley & Lardner*, Milwaukee and oral argument by *F. Thomas Creeron, III* and *Jon P. Axelrod.*

PER CURIAM The Libertarian Party et al. (Libertarian Party) brings this declaratory judgment action to challenge the constitutionality of 1995 Wis. Act 56 (the Stadium Act) on state grounds. The Sta-

dium Act provides for the formation of local baseball park districts and empowers those districts to build and maintain professional baseball park facilities. The Libertarian Party argues that the Stadium Act is unconstitutional for the following reasons: (1) the Stadium Act is a special or private tax law in violation of Wis. Const. art. IV, §§ 31 and 32; (2) the Stadium Act permits the contracting of state debt without a public purpose in violation of Wis. Const. art. VIII, §§ 4 and 7(2); (3) the Stadium Act violates the internal improvements clause of Wis. Const. art. VIII, § 10; (4) the Stadium Act violates the municipal debt limitation of Wis. Const. art. XI, § 3(3); and (5) the Stadium Act pledges state credit in violation of Wis. Const. art. VIII, § 3. We conclude the Stadium Act survives these constitutional challenges and accordingly, we deny the Libertarian Party's request for injunctive relief.

The facts are undisputed. 1995 Wisconsin Act 56 was enacted in a special legislative session after vigorous public debate. In passing the Stadium Act, the legislature determined that substantial statewide public purposes would be served by providing a mechanism for the formation of local baseball park districts in sufficiently populous areas of the state and empowering those districts to build and maintain professional baseball park facilities:

> (1) The legislature determines that the provision of assistance by state agencies to a district under this subchapter, any appropriation of funds to a district under this subchapter and the moral obligation pledge under § 229.74(7) serve a statewide public purpose by assisting the development of a professional baseball park in the state for providing recreation, by encouraging economic development and tourism, by reducing unemployment and by

796

bringing needed capital into the state for the benefit
and welfare of people throughout the state.

1995 Wisconsin Act 56, § 51 (creating § 229.64).[1] The
Stadium Act provides for the creation of local profes-
sional baseball park districts to include any county
within the state with a population in excess of 500,000
and all counties that are contiguous to that county and
not already included in a different district. § 51 (creat-
ing § 229.67). The governing board of a district is to
consist of members appointed by the governor, the
mayor of the most populous city within the district and
the county executives of those counties located within
the district. § 51 (creating § 229.66). A district is
empowered to construct and operate professional base-
ball park facilities, although the initial construction
costs of the facilities may not exceed $250 million. § 51
(creating § 229.68).

A district may issue revenue bonds for a portion of
these costs (if a supermajority of the members of the
board agree) and is empowered to impose a sales and
use tax to repay the bonds. The tax is not to exceed 0.1
percent of covered transactions and may be imposed
only within a district's boundaries. § 38 (creating
§ 77.705) and § 51 (creating § 229.68). The proceeds of
this tax are to be deposited in a special fund to be used
for operating expenses and retirement of the bonds.
§ 51 (creating § 229.685). A district has no other taxing
power and bondholders may not look to its property, or
any property within the district, as security or a source
of repayment.

The state is not obligated on and does not guaran-
tee the bonds, although under certain circumstances

---

[1] All future references are to 1995 Wis. Act 56 unless other-
wise indicated.

the state may provide a nonbinding "moral obligation" pledge. § 51 (creating §§ 229.74(7) and 229.75). The state may provide certain services to the district, some of which may be provided only for compensation and only if land has been granted to the state, and the state has entered into a lease agreement with the district. *See* § 4 (creating § 16.82(6)); § 6 (creating § 16.854); § 7 (creating § 18.03(5s)); § 13 (creating § 20.505(1)); § 46 (creating § 77.76(1)); § 47 (creating § 77.76(3m)). The legislation contains a specific disclaimer that a district is not authorized to create a debt of the state or a county in the district's jurisdiction. All bonds issued by a district are payable solely from the funds pledged for their payment as specified in the bond resolution authorizing the issuance. § 51 (creating § 229.75(2)). In addition, neither the state nor the counties in a district are liable for the payment of the principal or interest on the bonds or the performance of any pledge or obligation or agreement that may be undertaken by a district. Therefore, any such pledge, obligation or agreement undertaken by a district poses no pecuniary liability or charge upon the general credit or taxing power of the state or a county in the district. § 51 (creating § 229.75(2)).

Furthermore, the bonds issued by a district are secured only by the district's interest in the baseball park facilities, by income from the facilities, by proceeds from the bonds issued by the district and amounts placed in a special redemption fund, investment earnings, and by the sales and use taxes imposed by the district. § 51 (creating § 229.75(3)). The district is prohibited from pledging its full faith and credit on the bonds, and the legislature has declared that the bonds are not a liability of the district. § 51 (creating § 229.75(3)).

Following the enactment of this legislation, an entity known as the Southeast Wisconsin Professional Baseball District (the District)[2] consisting of Milwaukee County and its four contiguous counties of Ozaukee, Racine, Washington and Waukesha, was formed. The governing board of the District has been appointed, and the District has entered into various agreements to construct a new stadium to be built on a site adjacent to the current Milwaukee County Stadium. Under these agreements, the District will own 64 percent of the new stadium facilities, and the Milwaukee Brewers, a professional baseball team franchise, will own the remaining 36 percent. The stadium will be built on land owned by the state and leased for a 99 year term to the District. In addition, the District will sublease the new stadium facilities to the Brewers for a 30 year period. This new 42,500 seat stadium, consistent with the authorizing legislation, will cost a maximum of $250 million.

Of that total cost, the District will provide $160 million. That money will come from, among other sources, sales and use tax revenues and other revenues raised by the District's issuance of tax exempt revenue bonds. Although the bonds have not yet been issued, the governing board of the District by resolution has authorized a 0.1 percent sales and use tax to be collected commencing on January 1, 1996, in the five counties comprising that District.

The remaining $90 million needed for the construction of the new stadium will come from the Brewers. The team has agreed to make a $90 million "equity contribution" to the project construction fund.

---

[2] We will refer to the Southeast Wisconsin Professional Baseball District as "the District" throughout the remaining text of the opinion.

In addition, the Brewers will pay an annual rent equal to 10 percent of the total annual debt service payable by the District on the District's tax exempt revenue bonds, an estimated $1.1 million per year for the 30 year term of the lease between the Brewers and the District.

On November 20, 1995, Governor Thompson et al. (Governor) petitioned this court for leave to commence an original action for declaratory judgment seeking a declaration that the Stadium Act is constitutional. Upon accepting original jurisdiction, and recognizing that the Libertarian Party had previously commenced an action in Milwaukee County Circuit Court, this court "inverted" or realigned the parties, directing that the Libertarian Party should be henceforth denominated Petitioners, and the Governor should be denominated as the Respondent in this original action.[3]

The Libertarian Party argues that the Stadium Act violates several provisions of the state constitution and asks this court to grant a permanent injunction restraining the implementation of the act. The Libertarian Party asserts 15 separate constitutional

[3] The Libertarian Party subsequently filed a brief that was 111 pages long. In addition to exceeding the 50-page limitation specified in Wis. Stat. § 809.19(8), that brief and appendix failed to comply with other appellate rule requirements. As a consequence, on December 12, 1995, this court issued an order directing that the Libertarian Party file a new brief and appendix fully complying with all the requirements.

In response to this order, the Libertarian Party filed a purported "Notice of Dismissal" asserting that they dismissed the case pursuant to Wis. Stat. § 805.04. This court rejected the notice of dismissal. Subsequently, the Libertarian Party submitted what they denominated as a "special appearance" brief.

challenges. Upon reviewing the record and briefs, however, we recognize that not all of the challenges are meritorious. Therefore, any of the Libertarian Party's challenges not discussed with specificity can be deemed to lack sufficient merit to warrant individual attention. *See State v. Waste Management of Wisconsin, Inc.*, 81 Wis. 2d 555, 564, 261 N.W. 2d 147, 151 (an appellate court need not address every issue raised), *cert. denied*, 439 U.S. 865, 99 S. Ct. 189 (1978).

We begin with the presumption that the Stadium Act is constitutional and must be upheld unless proven unconstitutional beyond a reasonable doubt. *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 370, 293 N.W.2d 504 (1980); *State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 412-13, 208 N.W.2d 780 (1973). Our legislature has plenary power except where forbidden to act by the Wisconsin Constitution. Such general police power is in sharp contrast to that exercised by Congress, which has only those powers specifically provided by the United States Constitution: "[I]t is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the constitution of the United States." *Bushnell v. Beloit*, 10 Wis. 155, 168-69 (1860).

## THE ACT IS NOT A SPECIAL OR PRIVATE TAX LAW

We begin our discussion with the Libertarian Party's claim that the Stadium Act violates Wis. Const. art. IV, § 31(6) which prohibits the legislature from

801

enacting any "special or private laws . . . for assessment or collection of taxes."⁴

The Libertarian Party claims that, by authorizing a sales and use tax that applies only in five counties and by providing for income, franchise and property tax exemptions that may be beneficial to the Milwaukee Brewers, the Stadium Act violates Wis. Const. art. IV, § 31(6) which prohibits the enactment of private laws. Additionally, the Libertarian Party contends that because the legislation exempts the stadium facilities from real and personal property taxes, the Stadium Act grants a local property tax exemption, which directly provides economic benefit to the Milwaukee Brewers.

A claim under Wis. Const. art. IV, § 31 is resolved by determining whether the law is a permissible enactment under art. IV, § 32, which provides:

> The legislature may provide by general law for the treatment of any subject for which lawmaking is prohibited by section 31 of this article. Subject to reasonable classifications, such laws shall be uniform in their operation throughout the state.

---

⁴Wisconsin Const. art. IV, § 31 entitled "Special and Private Laws Prohibited" prohibits the legislature from enacting special or private laws in nine different classes of situations. Subsection 6 prohibits such laws for "assessment or collection of taxes." While § 31 provides substantive prohibitions, its companion section, § 32, provides the methods by which laws in the nine subject areas enumerated in § 31 may be passed, i.e., any legislative enactments must be "general laws" and operate uniformly throughout the state. *See City of Brookfield v. Milwaukee Metropolitan Sewerage District*, 144 Wis. 2d 896, 905, 426 N.W.2d 591 (1988).

This court has consistently applied certain rules for determining the legislature's competence under Wis. Const. art. IV, § 32 to pass laws affecting only certain entities, such as cities or counties of a certain class or size, notwithstanding the prohibitions of Wis. Const. art. IV, § 31. These rules are as follows:

> First, the classification employed by the legislature must be based on substantial distinctions which make one class really different from another.
>
> Second, the classification adopted must be germane to the purpose of the law.
>
> Third, the classification must not be based on existing circumstances only. Instead, the classification must be subject to being open, such that other cities could join the class.
>
> Fourth, when a law applies to a class, it must apply equally to all members of the class.
>
> . . . .
>
> [Fifth,] the characteristics of each class should be so far different from those of the other classes so as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*City of Brookfield*, 144 Wis. 2d at 907-08. If a law passed by the legislature meets all these criteria, then it is a "general law" and uniform within the meaning of Wis. Const. art. IV, § 32 and therefore proper, notwithstanding that it comes within one of the specific categories of prohibited legislation found within Wis. Const. art. IV, § 31. "[I]f the legislation being challenged contains classifications which are open, germane, and relate to true differences between the entities being classified, then the legislation is consid-

803

ered general and of uniform application." *City of Brookfield*, 144 Wis. 2d at 911.

In the present case, the classification employed in the Stadium Act satisfies all five of the *Brookfield* requirements. First, the classification employed by the legislature makes a substantial distinction on the basis of population. Wisconsin Stat. § 229.67 provides that each district consists of "any county with a population of more than 500,000 and all counties that are contiguous to that county and that are not already included in a different district." Population has frequently been upheld as a relevant ground upon which to create legislative distinctions. In *Johnson v. The City of Milwaukee*, 88 Wis. 383, 391, 60 N.W. 270 (1894), a case decided soon after the Constitution was amended to create Wis. Const. art. IV, §§ 31 and 32, this Court stated:

> It is usually appropriate to classify by population, especially where the object to be advanced by it bears fairly a relation to the number of population in either class; and, while opinions may fairly differ as to where the line of distinction should be drawn, that is fairly a subject for the exercise of legislative discretion. It is not open to question by the courts, unless it shall appear to be a mere device to evade the constitutional provisions.

*Id.* at 391.

Second, the classification adopted in the Stadium Act is germane to the purposes of the law. The purpose of the Stadium Act is to promote the recreational opportunities that flow from an economically viable professional baseball team and economic development associated with baseball. § 51 (creating § 229.64(1) and

804

(2)). In *State v. Milwaukee Braves, Inc.*, 31 Wis. 2d 699, 710, 144 N.W.2d 1 (1966), *cert. denied*, 385 U.S. 990 (1967), this court acknowledged that substantial business activity is generated by major league games played before large crowds. In addition, Milwaukee, unlike smaller communities, "has the demographic economic and population characteristics necessary to support a Major League baseball club." *Id.* In the present case, the legislature rationally could have concluded that the only area in the state that could currently support major league baseball was a populous county such as Milwaukee and its four contiguous counties. Greater population ensures more ticket sales and better corporate support. It also promises a greater economic multiplier from spending for food, lodging and entertainment, and a larger base of economic activity to generate revenue to defray the District's expenses.

In addition, the legislature could have rationally concluded that the activities of the District ought to be paid for by a tax on economic activity within its boundaries. Contrary to the Libertarian Party's assertion that "geographical disparities" are not allowed, a variety of this state's taxes are only imposed within the boundaries of local units of government. Local property taxes and sales taxes are two such examples. In this case, by requiring sufficient population, the legislature properly precluded the formation of districts that are unlikely to support professional baseball.

Third, the classification is open such that other districts can be created. A district may be created whenever any county attains a population of more than 500,000. § 51 (creating § 229.64(2)). The only argument in the Libertarian Party's brief regarding the *Brookfield* test is that the Stadium Act does not establish an

"open" classification. The Libertarian Party contends that "realistically, no other city in Wisconsin will ever have a major league baseball team as long as Milwaukee has one."

In *Thielen v. Metropolitan Sewerage Commission*, 178 Wis. 34, 189 N.W. 268 (1922), this court upheld a law allowing sewerage commissions to be established in counties containing a first-class city. The only first-class city in the state was Milwaukee. The law provided for funding of the district's operations through a district-wide property tax to be imposed only in that district. *Id.* at 36-39. This court rejected the claim that the law violated Wis. Const. art. IV, § 31 because it could only apply to Milwaukee County. It held that, although no other county was likely to utilize that law, it was still a general enactment and therefore did not violate § 31:

> Whatever may be said for or against a classification which permits the enactment of legislation which in fact at the time of its adoption applies and in all human probability for some considerable time in the future can never apply to any but a single county within the state, it is a matter which is no longer an open question in this state. The act being by its terms general, it is not within the provisions of sub. 7, sec. 31, art. IV, Const.

*Id.* at 51.

In the present case, it is immaterial that the area surrounding Milwaukee County is currently the only area within the class created by the Stadium Act. The Stadium Act is properly subject to being open such that other cities can join the class.

Fourth, the Stadium Act applies equally to all members of the class. Its terms govern all baseball park districts, without exception.

Fifth, "the characteristics of each class [are] so far different from those of the other classes so as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation." *Davis v. Grover*, 166 Wis. 2d 501, 536, 480 N.W.2d 460 (1992). This court recognized in *Davis* that a large urban area was the best location to experiment with legislation aimed at improving the quality of education. *Id.* at 535. Milwaukee County and its contiguous counties, having the greatest population concentration in the state, provide a class that is substantially different from other population concentrations in the state.

The Libertarian Party also contends that the Stadium Act's income, franchise and property tax exemptions violate Wis. Const. art. IV, § 31 and benefit only the Brewers. We disagree. Wisconsin Stat. § 70.11(36) (1993-94), which contains a property tax exemption for all professional sports facilities, was created by 1991 Act 37, § 34. Its validity is not involved in this proceeding and, even if it were, no question of classification arises because the exemption applies to all professional sports and entertainment stadiums.

Moreover, the tax exemption contained in the Stadium Act is for the District and its bonds, not professional baseball teams. The District's property and bonds are treated like those of any other local unit of government. Any incidental benefit inuring to the Brewers is legally immaterial for purposes of this analysis. Whether the legislature's basis for the classification is wise and judicious, and whether it operates as fairly as other classifications are questions for the legislature, not for the courts. *Madison Metro-*

*politan Sewerage Dist. v. Committee on Water Pollution*, 260 Wis. 229, 252-53, 50 N.W.2d 424 (1951). As this court said in *Land, Log & Lumber Co. v. Brown*, 73 Wis. 294, 40 N.W. 482 (1889):

> It is for the legislature to fix the limits of the taxing district, and not for the courts . . . So in regard to local improvements in cities, this court holds that the district to be taxed for such improvements may be fixed, either directly or indirectly, by the legislature; and that the justice or injustice of the limits of the taxing district, when fixed by the legislature or some other authority authorized by law to fix the same, cannot be questioned by the courts.

*Id.* at 304.

Based on the above, we conclude that the Stadium Act contains classifications which are open, germane, and relate to true differences between the entities being classified. Therefore, the Stadium Act is not a special or private tax law.

## CONTRACTING STATE DEBT WITHOUT A PUBLIC PURPOSE

Read together, Wis. Const. art. VIII, §§ 4 and 7(2) provide:

> The state shall never contract any public debt except . . . [t]o acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, railways, buildings, equipment or facilities for public purposes.

The prohibitions embodied in this paragraph are aimed at assuring that public money be raised and used only for public purposes. The question, therefore,

is whether the Stadium Act satisfies the constitutional requirement of fostering a valid public purpose.

The Libertarian Party argues that the Stadium Act creates a public debt in violation of Wis. Const. art. VIII, § 4 and is not within any of the public purpose exceptions identified in Wis. Const. art. VIII, § 7(2) for which the state may incur a public debt. In essence, the Libertarian Party contends that baseball can never constitute a legitimate public purpose. We disagree.

First, the Libertarian Party's argument fails to distinguish between the District authorized under the Stadium Act and the game of baseball itself. The question is not whether the game of baseball or the Milwaukee Brewers serve a public purpose; rather, the question is whether the legislation creating local baseball park districts satisfies the public purpose doctrine.

In *State ex rel. Bowman v. Barczak*, 34 Wis. 2d 57, 148 N.W.2d 683 (1967), this court recognized that although there is no specific clause in the state constitution establishing the public purpose doctrine, nevertheless such doctrine is firmly accepted as a basic constitutional tenet mandating that public appropriations may not be used for other than public purposes. *Id.* at 62. The public purpose doctrine commands that public funds can be used only for public purposes. *State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 211, 170 N.W.2d 790 (1969). In *Reuter*, this court described the public purpose concept as follows:

> [T]he concept of public purpose is a fluid one and varies from time to time, from age to age, as the government and its people change. Essentially, public purpose depends upon what the people expect and want their government to do for the soci-

ety as a whole and in this growth of expectation, that which often starts as hope ends as entitlement.

*Id.* at 213.

Although this court is not bound by the declaration of public purpose contained in any legislation, what constitutes a public purpose is, in the first instance, a question for the legislature to determine and its opinion must be given great weight by this court. *Id.* at 212.

In the present case, the legislature has expressly declared that the formation of local baseball park districts will serve a statewide public purpose by "encouraging economic development and tourism, by reducing unemployment and by bringing needed capital into the state for the benefit and welfare of people throughout the state." § 51 (creating § 229.64). These are clearly public purposes and will provide direct, not remote, advantages or benefits to the public at large. *See State ex rel. Wisconsin Dev. Authority v. Dammann*, 228 Wis. 147, 277 N.W. 278 (1938).

In addition, the fact that a private entity such as the Brewers will benefit from the Stadium Act does not destroy the predominant public purpose of this act. In *Reuter*, this court addressed a similar argument against a legislative appropriation to the Marquette School of Medicine. That appropriation was challenged as supporting a private school which would not serve a public purpose. We found that this argument confused the means with the end and explained that an act is constitutional if it is designed in its principal parts to promote a public purpose so that the attainment of the public purpose is a reasonable probability. *Reuter*, 44 Wis. 2d at 214. The benefit to the private Marquette School of Medicine was not enough to destroy the public purpose of that appropriation. Similarly, the fact

810

that a private entity such as the Brewers might benefit from the Stadium Act does not destroy the predominant public purposes of this act.

Other jurisdictions have reached similar conclusions. *See* Annotation: *Validity of Governmental Borrowing or Expenditure for Purposes of Acquiring, Maintaining or Improving Stadium for Use of Professional Athletic Team*, 67 A.L.R.3rd 1186 (1976).[5] In *Lifteau v. Metropolitan Sports Facilities Commission*, 270 N.W.2d 749 (Minn. 1978), the Minnesota Supreme Court held that the construction of a publicly owned sports facility for use by professional sports organizations and others was a public purpose for which public funds could constitutionally be expended. The court stated:

> The trial court found that the public desire for sports facilities was great and we may take judicial notice of the important part that professional sports plays in our social life.
>
> . . .
>
> We are not persuaded by plaintiff's argument that the law is a bad law because it benefits indirectly some private individuals or corporations; that it is economically unsound; that stadia all over the

---

[5] In every case considering the issue except two—*Brandes v. Deerfield Beach*, 186 So. 2d 6 (Fla. 1966), and *In Re Opinion of Justices*, 250 N.E.2d 547 (Mass. 1969), it has been held that the acquisition or construction of a stadium to be used in part by one or more professional sports teams constitutes a public purpose for which public expenditures could be legally undertaken. *See City of Los Angeles v. Superior Court*, 333 P.2d 745 (Ca. 1959); *Ginsberg v. Denver*, 436 P.2d 685 (Co. 1968); *Alan v. County of Wayne*, 200 N.W. 2d 628 (Mich. 1972); *Bazell v. Cincinnati*, 233 N.E.2d 864, *cert. denied and appeal dismissed*, 391 U.S. 601 (1968); *Meyer v. Cleveland*, 171 N.E. 606 (Ohio 1930); *Martin v. Philadelphia*, 215 A.2d 894 (Pa. 1966).

country have experienced cost overruns; and that the new stadium, if built, will prove to be a "loser" from a revenue standpoint. These arguments are proper arguments to be made to the legislature, or to the Commission itself.

. . .

Decisions such as these are economic matters and political decisions to be made by legislative bodies, not the courts.

*Id.* at 754-55.

We agree. More than 65 years ago, this court recognized that providing for recreation—i.e., a wildlife refuge—was a public purpose and a matter for legislative discretion. *State ex rel. Hammann v. Levitan*, 200 Wis. 271, 228 N.W. 140 (1929). In *Levitan*, this court stated:

What should be done in the way of providing public recreation is in the first instance a matter of legislative discretion. Whether the project set up in the laws under consideration here is the best or wisest method of expending public funds is a matter for the determination of the legislature.

*Id.* at 281.

Therefore, legislative determinations of public purpose should be overruled only if it can be established that the particular expenditure is "manifestly arbitrary or unreasonable." *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 56, 205 N.W. 2d 784 (1973). The Libertarian Party's assertion that the benefit to the public is only incidental in comparison to the benefit to the Milwaukee Brewers does not satisfy this burden. While some private benefit will result, the project is sufficiently public in nature to withstand con-

stitutional challenge. Therefore, we conclude that the Stadium Act authorizes constitutionally permissible expenditures for a public purpose.

## THERE IS NO INTERNAL IMPROVEMENTS VIOLATION

We now address whether the Stadium Act violates the internal improvements clause of the Wisconsin Constitution. Wisconsin Const. art. VIII, § 10 provides in part:

> Except as further provided in this section, the state may never contract any debt for works of internal improvement, or be a party in carrying on such works.
>
> (1) Whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion.

This clause prohibits the state from being a party in carrying on any work of internal improvement, unless a grant of land or other property has been made to it, specifically dedicated by the grant to such work. *Sloan, Stevens & Morris v. State*, 51 Wis. 623, 629-32, 8 N.W.2d 393 (1881).

The questions that must be answered in any challenge to this provision are "(1) Is the object sought to be accomplished an 'internal improvement'; (2) does it call for the State to 'contract any debt' to carry it out, or; (3) does the legislation cause the State to 'be a party in carrying on such works'?" *Development Dept. v. Bldg. Comm'n*, 139 Wis. 2d 1, 7, 406 N.W.2d 728 (1987). If

813

this court concludes that the stadium is not an internal improvement, our analysis of this clause is at an end.

■

We begin with the recognition that not all construction projects are works of internal improvement. The state may directly engage in construction or other activities if those activities are incident to a predominantly governmental purpose:

> If a law is predominantly public in its aim, it will not be held to violate the internal improvements provision, in spite of the fact that the state carries on internal improvements incident to the main public purpose of the law.

*Wisconsin Solid Waste Recycling Auth. v. Earl*, 70 Wis. 2d 464, 492, 235 N.W.2d 648 (1975).

The question of whether any particular activity involves a predominantly governmental function varies with time: "[B]oth this court and the legislature have been cognizant of changing times and the ever-changing needs of the state and its people." *State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 435-36, 208 N.W.2d 780 (1973). At least two factors are considered: "(1) [t]he dominant governmental function, and (2) the inability of private capital to satisfy the need." *Id.* at 436.

In *State v. Milwaukee Braves, Inc.*, 31 Wis. 2d 699, 721, 144 N.W.2d 1 (1966), we declared that "the interest of the state in preserving business activity within its borders" was a valid governmental interest with respect to a professional baseball team. This court has also upheld state construction for recreational purposes. *See Levitan*, 200 Wis. at 277 (1929) (construction of a wildlife refuge facility). In *Levitan*, we stated:

> We should not place a narrow or restricted construc-
> tion upon a constitutional amendment so obviously
> intended by the people to confer authority upon the
> state to promote the general welfare in this field. As
> the country emerges more and more from pioneer
> conditions, problems connected with public recrea-
> tion become more and more prominent. Compared
> with former times the people of this country enjoy a
> large amount of leisure. The proper employment of
> this leisure constitutes one of our newest but in
> many respects one of our most important problems.
> Whether leisure is a social asset or a social liability
> depends upon the use which is made of it.

*Id.* at 280-81. Like the recreational benefits obtained from natural parks, recreational benefits are also received from sports facilities.

Furthermore, we find no merit to the Libertarian Party's argument that construction of the stadium serves a predominantly private purpose. In *Lifteau*, the Minnesota Supreme Court upheld legislation creating a seven county metropolitan sports taxing district simi-lar to the professional baseball district authorized in the Stadium Act. Relying on the cases collected in 67 A.L.R.3rd 1186 (1976), the Minnesota court noted that: "In every case considering the issue except two . . . it has been held that the acquisition or construction of a stadium to be used in part by one or more professional sports teams constitutes a public purpose for which public expenditures could be legally undertaken." *Lifteau*, 270 N.W. 2d at 753-54.

In the present case, the purposes of the Stadium Act, as stated by the legislature, are as follows:

> [To] assist[ ] the development of a professional base-
> ball park in the state for providing recreation, by
> encouraging economic development and tourism, by

reducing unemployment and by bringing needed capital into the state for the benefit and welfare of people throughout the state.

§ 51 (creating § 229.64(1)).

The reduction of unemployment, the promotion of tourism, and the encouragement of industry are all predominately governmental purposes sufficient to avoid a violation of the internal improvements clause. *See Earl*, 70 Wis. 2d at 481, 492; *State v. Village of Lake Delton*, 93 Wis. 2d 78, 93, 286 N.W. 2d 622 (Ct. App. 1979). Therefore, we conclude that the Stadium Act does not violate Wis. Const. art. VIII, § 10, barring state participation in works of internal improvement.

## VIOLATION OF MUNICIPAL DEBT LIMITATION

The Libertarian Party claims that, by letting the District borrow money when it lacks the power to levy a direct annual tax to repay the borrowed money, the Stadium Act violates the municipal debt limitation contained in Wis. Const. art. XI, § 3(3) which provides:

> Any county, city, town, village, school district . . . or other municipal corporation incurring any indebtedness . . . shall . . . provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within 20 years from the time of contracting the same.

This constitutional debt limitation seeks to ensure that a political subdivision does not become overburdened by obligations. It seeks to impose the burden of debt repayment upon those who create the

816

obligations, not upon future generations. *City of Hartford v. Kirley*, 172 Wis. 2d 191, 204, 493 N.W.2d 45 (1992). We have acknowledged that the constitution does not prohibit creative financing. *Id.* We judge each new, creative financing technique according to its own attributes, its similarity to other financing arrangements the court has examined, and to the objectives of the constitutional debt limit. *Id.* at 205.

In the present case, the District's bonds are payable solely from a special fund that does not include any property tax revenues. In this respect, the District's bonds are analogous to special assessment bonds which do not create an indebtedness. *Fowler v. City of Superior*, 85 Wis. 411, 54 N.W. 800 (1893).

In *City of Hartford*, this court compared the characteristics of special assessment bonds to tax increment bonds. We noted that "[d]ebts secured by special assessments . . . do not burden any property of the municipality other than the revenues from the special assessment tax pledged as repayment." *City of Hartford*, 172 Wis. 2d at 207. In contrasting tax increment financing with special assessments which are generated in addition to general property taxes, this court noted that special assessments do not impinge on the municipality's general property tax revenues.

> Unlike special assessments, which are generated in addition to general property taxes, tax increments are not independent sources of revenue. Nor does tax incremental financing involve a special tax; . . . the municipality does not impose any special taxes to pay off [tax increment] bonds.

*Id.* at 207.

The District's bonds have the same characteristics as special assessment bonds. Under the Stadium Act, tax revenues from the sales and use taxes that the District may impose are placed in a special fund. § 51 (creating § 229.685). These taxes, imposed under Wis. Stat. Chapter 77, subchapter V, are specifically identified as "special taxes that are generated apart from any direct annual tax on taxable property." § 51 (creating § 229.64(1)). Moreover, the District may not levy any taxes that are not expressly authorized under the provisions of subchapter V of Wis. Stat. ch. 77. *See* Wis. Stat. § 229.68(15). Consequently, the District may not levy property taxes for purposes of securing any bonds the District might issue. Not only does the District lack power to levy or pledge any property tax revenue, it cannot pledge its full faith and credit, and no funds of the District other than those placed in the special fund may be used for payment of debt service. § 51 (creating § 229.75(3)). Therefore, the District's bonds do not create indebtedness within the meaning of Wis. Const. art. XI, § 3(3).

Further, the Stadium Act is entirely consistent with the "special fund doctrine." This doctrine recognizes that "an obligation payable exclusively from a special fund created by the imposition of fees, penalties or excise taxes, and for the payment of which the general credit of the state or municipality is not pledged . . . is not a debt within the meaning of constitutional debt limitations." Annotation, 100 A.L.R. 900, 901 (1936). *See, e.g., State v. Tampa Sports Authority*, 188 So. 2d 795, 797 (Fla. 1966) (sources other than *ad valorem* taxes were pledged to support bonds); *City of Phoenix v. Phoenix Auditorium and Convention Center Assn.*, 412 P.2d 43, 44 (Ariz. 1966) (excise taxes were pledged to

support bonds). One commentator describes the special fund doctrine as follows:

> The courts of a majority of the states, in applying the Special Fund Doctrine concerned themselves with the obligation to pay the debt service of the bonds. If the pledge was to pay such debt service solely from revenues other than the property tax, then the doctrine applied and permitted the financing of structures and services which, in themselves, were not revenue producing . . . .

Charles S. Rhyne, *Municipal Law* 14-7, at 335 (1957).

We find that under the Stadium Act, the bonds to be issued by a baseball park district are revenue bonds which are payable only from the sales and use taxes the District is authorized to impose and revenue from the stadium itself. The Stadium Act mandates that the District can only issue bonds pursuant to Wis. Stat. § 66.066, the specific statute authorizing a municipality—including a local professional park district—to issue revenue bonds. *See* § 51 (creating § 229.68(8)) (granting the stadium district power to issue revenue bonds under § 66.066). Moreover, the bonds to be issued by the District are secured by the District's interest in the park's facilities, the income from those facilities, by the proceeds of the bonds issued by the District, and by the sales and use taxes imposed by the District. Wis. Stat. § 229.75(3). No property tax revenues are involved.

Finally, the District's bonds are also obligations of a public utility, that is, a revenue-producing enterprise that serves a public purpose. The Wisconsin constitution includes an exception for public utilities in Wis. Const. art. XI, § 3(5):

An indebtedness created for the purpose of purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility of a town, village, city or special district, and secured solely by the property or income of such public utility, and whereby no municipal liability is created, shall not be considered an indebtedness of such town, village, city or special district . . . .

The term "public utility" as used in Wis. Const. art. XI, § 3(5) "must be considered to include all plants or activities which the legislature can reasonably classify as public utilities in the ordinary meaning of the term." *Payne v. Racine*, 217 Wis. 550, 555, 259 N.W. 437 (1935). Moreover, "anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes." *Capen v. City of Portland*, 228 P. 105, 106 (Ore. 1924).

The Stadium Act expressly declares that, for financing purposes, baseball park facilities are public utilities. Wis. Stat. § 24 (creating § 66.067). The Stadium Act also declares that baseball park facilities serve the public interest by providing recreation, as well as encouraging economic development and tourism, and reducing unemployment. § 51 (creating § 229.64(1)). Finally, the Stadium Act treats the sales and use tax revenues as income of the utility. § 22 (creating § 66.066(1)(c)).

Therefore, because the District's bonds do not create an indebtedness, and because the municipal debt limitation does not apply to the District, we conclude that the Stadium Act does not violate the municipal debt limitation.

## PLEDGE OF STATE CREDIT

The Libertarian Party's final argument is that the Stadium Act pledges state credit for the benefit of the Brewers in violation of Wis. Const. art. VIII, § 3, which provides that "the credit of the state shall never be given, or loaned, in aid of any individual, association or corporation." This section prohibits the state from granting its credit in aid of a private business.

The Libertarian Party advances three arguments under this section: (1) that the clause prohibits gifts as well as loans, and the Stadium Act contains certain cash and "in-kind" subsidies; (2) that the state and the District created under the act are "a legal identity" and thus, the District's liability on any bonds is actually the state's liability; and (3) that the Stadium Act's declaration of a "moral obligation" to pay the bonds in the event of default creates a legal obligation. We address each argument in turn.

The Libertarian Party's primary argument focuses on what they refer to as the "massive state financing" of this stadium project which includes $160 million of revenue bonds to be issued by the District plus another $50 million of bonds to be issued by WHEDA. According to the Libertarian Party, because the proceeds from both will go directly to the Brewers, the "no credit" clause of the state constitution is violated.

Wisconsin Const. art. VIII, § 3 prohibits the pledge of the state's credit on behalf of any private person, but this section says nothing about grants of cash or subsidies, or the provision of services. We agree that such activities must serve a public purpose and satisfy other constitutional limitations. However, the Libertarian Party provides no support for its suggestion that state grants implicate the credit clause. To reach such a con-

clusion would put in jeopardy many of our current state subsidies, such as unemployment compensation, welfare, and tuition grants. This we decline to do.

Second, the Libertarian Party argues that a local professional baseball district does not have a separate legal identity, but is merely an "administrative agency" of the state.

This court has previously held that the legislature has the power to create local units of government which are not subject to the same constitutional restrictions as the state. In *Redevelopment Authority v. Canepa*, 7 Wis. 2d 643, 97 N.W.2d 695 (1959), this court recognized that "in a sense all governmental bodies created under the constitution of the state, including cities and villages, could be termed 'state agencies.' " *Id.* at 652. This court also observed that:

> [W]hile the state is subject to the prohibitions limiting the power of the state to contract a debt and prohibiting the carrying on of works of internal improvement, governmental units created by the state and carrying on their public functions in particular localities or geographical subdivisions of the state are not so subject.

*Id.* at 651.

In *State ex rel. Gubbins v. Anson*, 132 Wis. 461, 112 N.W. 475 (1907), this court discussed at length the legislature's authority to create a new governmental unit with territorial limits different from those of existing counties, cities or other municipal corporations. It concluded that the legislature has the power to alter the delegation of powers to local governmental units, and that in creating new units of government, it

may provide for the governance of such bodies as it sees fit.

Finally, in *Warren v. Nusbaum*, 59 Wis. 2d 391 (1973), this court considered whether the Wisconsin Housing Finance Authority was subject to many of the same limitations and prohibitions that the Libertarian Party suggests apply to a local professional baseball district. The Authority was governed by a board made up of solely appointed members, serving without compensation, and was denominated by the legislature as a body corporate, separate from the state. Recognizing that it must look beyond such a legislative denomination and examine the powers and structure conferred upon the Authority, this court focused on the Authority's powers, including the power to sue and be sued, to enter into contracts, to incur debt, and to own, improve and convey real estate. We held that the Authority was a separate entity from the state. *Id.* at 424.

In the present case, the District has similar powers. For example, the District has the power to sue and be sued in its own name, and significantly, like all the counties in the state, the District has the power to levy sales and use taxes. Although the Stadium Act places an upper limit on the tax rate that may be imposed, the District is nonetheless empowered to impose a sales and use tax. The fact that the District might use the state to collect those taxes or that the District has an appointed board, does not lead to the conclusion that the District is legally identical to the state.

Third, the Libertarian Party contends that the "moral obligation" pledge in § 51 (creating § 229.74(7)) creates an impermissible state liability because the state has acknowledged a moral obligation to pay the bonds if the team defaults; therefore, such an obligation amounts to a loan of the state's credit.

823

However, absent a legally enforceable contractual obligation on the part of the state, Wis. Const. art. VIII, § 3 cannot be violated:

> It is our conclusion that the giving or loaning of the credit of the state which it was intended to prohibit by sec. 3, art. VIII, Wis. Const., occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party.

*Dammann*, 228 Wis. at 197. Here, § 51 (creating § 229.75) specifically provides that the state is not liable for the actions of the District. This section also provides that the state is not liable on the District's bonds, that the bonds are not a debt of the state and that the bonds must contain a statement to that effect. 1995 Wis. Act § 51 (creating § 229.75(2)) provides:

> The state and each county in the district's jurisdiction are not liable for the payment of the principal of or interest on a bond or for the performance of any pledge, mortgage, obligation or agreement that may be undertaken by a district. The breach of any pledge, mortgage, obligation or agreement undertaken by a district does not impose pecuniary liability upon the state or a county in the district's jurisdiction or a charge upon its general credit or against its taxing power.

1995 Wis. Act 56, § 51 (creating § 229.74(7)) provides for a moral obligation pledge in which the legislature "expresses its expectation and aspiration that, if ever called upon to do so . . .," it shall make an appropriation in an amount necessary to restore the special debt service reserve fund to an amount equal to

the special debt reserve fund requirement. This court has recognized that such a pledge creates no enforceable claim: "The term 'moral obligations' recognizes the absence of any legally enforceable claim. It is generally held that the state is not compelled to recognize moral obligations, but it is free, through appropriate legislation, to satisfy that which it recognizes as its moral debt." *Nusbaum*, 59 Wis. 2d at 430.

In *Nusbaum*, the court upheld a law challenged under Wis. Const. art. VIII, § 3, saying:

> The express negation of the Authority's power to incur debt on behalf of the state or to pledge the state's credit protects the enactment from the alleged violation of sec. 3, art. VIII, Wis. Const. There is no violation of such constitutional provision unless the giving of credit results in a legally enforceable obligation against the state.

*Id.* at 432.

This reasoning applies with equal force to the Stadium Act. The "moral obligation" in the Stadium Act does not create state debt nor pledge state credit, it merely expresses the legislature's intention that if ever called upon to do so, it will make appropriations to further the purposes and objectives of the legislation being challenged.

We conclude that because the District and state are not legally identical, and because the "moral obligation" pledge is not legally enforceable, the Libertarian Party's claim that the Stadium Act violates Wis. Const. art. VIII, § 3 must fail.

## CONCLUSION

The purpose of the Stadium Act is to promote the welfare and prosperity of this state by maintaining and increasing the career and job opportunities of its citizens and by protecting and enhancing the tax base on which state and local governments depend upon. It is clear that the community as a whole will benefit from the expenditures of these public funds. Creation of new jobs is of vital importance to the State of Wisconsin and economic development is a proper function of our government.

Therefore, after considering all of the arguments appropriately raised and presented by the Libertarian Party in their briefs and in oral argument, we conclude that such arguments are without merit. The legislature has carefully crafted the Stadium Act to conform to the law of this state. Accordingly, we declare 1995 Wisconsin Act 56 to be constitutional and deny the Libertarian Party's request for injunctive relief.

*By the Court*—Rights declared.

SHIRLEY S. ABRAHAMSON, J., did not participate.