William Alexander, Plaintiff-Appellant,

v.

City of Madison, Defendant-Respondent.

Court of Appeals

*No. 00–2692. Submitted on briefs May 4, 2001.—Decided August 2, 2001.*

2001 WI App 208

(Also reported in 634 N.W.2d 577.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Lester A. Pines* and *Tamara B. Packard* of *Cullen Weston Pines & Bach LLP* of Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Eunice Gibson*, city attorney, and *Robert E. Olsen*, assistant city attorney, of Madison.

Before Vergeront, P.J., Roggensack and Deininger, JJ.

¶ 1. ROGGENSACK, J. William Alexander appeals the circuit court's grant of summary judgment to

the City of Madison on his claim that ordinances that provide $10,000 economic development grants to successful applicants for a reserve Class B liquor license are unconstitutional. He argues that the ordinances violate the public purpose doctrine because (1) the benefits are too indirect and remote to constitute a public purpose and they lack accountability and control, and (2) they are "sham legislation." We conclude that Alexander has failed to meet his burden to demonstrate that the ordinances are unconstitutional beyond a reasonable doubt and that he has identified no Wisconsin law that supports his "sham legislation" theory. Therefore, we affirm the judgment of the circuit court.

## BACKGROUND

¶ 2. The essential facts related to this appeal are undisputed. Wisconsin municipalities set the fees for issuing and renewing liquor licenses, within a range established by the legislature. By means of 1997 Wis. Act 27, § 2907dh, the legislature required municipalities to set the fee to issue a reserve Class B liquor license[1] at not less than $10,000.[2]

---

[1] A Class B liquor license authorizes retail sale of intoxicating liquor by the glass for consumption on the premises. Wis. Stat. § 125.51(3)(a) (1999–2000). The holder also may sell wine for consumption off the premises and, in some municipalities, packaged liquor for consumption off the premises. *Id.*; § 125.51(3)(b). A reserve Class B liquor license is a license issued after January 1, 1998. Section 125.51(4)(a)4.

All further references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[2] Wisconsin Stat. § 125.51(3)(e)2. provides, as it has since its enactment:

¶ 3. In response to the legislative mandate, the City of Madison enacted an ordinance that set the fee to issue a reserve Class B liquor license at $10,000. Madison Gen. Ord. § 38.09(5)(d). However, the City also enacted an ordinance to make an economic development grant of $10,000 to the holder of a new reserve Class B license who had paid the $10,000 license fee and passed its other requirements for the issuance of the license. The relevant portions of ordinance § 38.09(5)(d) are as follows:

1. The City of Madison hereby finds that it is in the interests of the public welfare to increase the property tax base, provide employment opportunities, attract tourists and generally enhance the economic and cultural climate of the community by providing additional economic incentives for new businesses with liquor licenses.

2. After the granting of any new reserve Class B license and payment of the $10,000 initial issuance fee, the applicant may file an application for an economic development grant of $10,000 with the Clerk. The Clerk shall determine whether the licensee is operating in compliance with the approved license. The Clerk may require the assistance of any other City agency in making said determination. If the Clerk determines that the licensee is so operating, the Clerk shall authorize the approval of the $10,000 economic development grant. If the Clerk determines that the licensee is not in

Each municipal governing body shall establish the fee, in an amount not less than $10,000, for an initial issuance of a reserve "Class B" license, as defined in sub. (4)(a)4., except that the fee for an initial issuance of a reserve "Class B" license to a bona fide club or lodge situated and incorporated in the state for at least 6 years is the fee established under subd. 1. for such a club or lodge. The fee under this subdivision is in addition to any other fee required under this chapter. The annual fee for renewal of a reserve "Class B" license, as defined in sub. (4)(a)1., is the fee established under subd. 1.

compliance with the approved license, no economic development grant may be authorized and the Clerk shall make such finding in writing and cause to be delivered a copy of the findings to the licensee. If the licensee disagrees with the Clerk's determination, the licensee may file a written notice of appeal upon the Clerk within 10 (ten) calendar days of the delivery of the written notice of the Clerk's findings. Upon receiving such notice from the licensee, the Clerk shall relay said notice to the ALRC which shall hold a hearing thereon. The ALRC may affirm or reverse the Clerk's determination. If the Clerk's determination is upheld, appeal thereof may be taken to circuit court pursuant to Section 753.04, Wis. Stats. If the Clerk's determination is reversed, the Clerk shall authorize the payment of the economic development grant. (Cr. by Ord. 12,142, 6-1-98)

Madison Gen. Ord. § 38.09(5)(d). A companion ordinance also provided for a $10,000 economic development grant to those who paid $10,000 for a Class B license that was granted between December 1, 1997, and the effective date of the ordinance. Madison Gen. Ord. § 38.03(2)(d).

¶ 4. Alexander sued the City seeking declaratory judgment that Madison Gen. Ords. §§ 38.03(2)(d) and 38.09(5)(d)1. and 2. are unconstitutional because they violate the public purpose doctrine and because they constitute sham legislation. The circuit court granted summary judgment to the City, and Alexander appeals.

## DISCUSSION

**Standard of Review.**

¶ 5. We apply the same summary judgment methodology as the circuit court. *Cemetery Servs., Inc. v. Department of Regulation & Licensing*, 221 Wis. 2d 817,

823, 586 N.W.2d 191, 194 (Ct. App. 1998). We first examine the complaint to determine whether it states a claim, and then we review the answer to determine whether it joins a material issue of fact or of law. *Id.* If we conclude that the complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a *prima facie* case for summary judgment. *Id.* If they do, we look to the opposing party's affidavits to determine whether there are any material facts in dispute that entitle the opposing party to a trial. *Id.* Whether a particular ordinance was enacted for a public purpose is a question of law. *Hopper v. City of Madison*, 79 Wis. 2d 120, 128, 256 N.W.2d 139, 142 (1977). However, we give the common council's determination of this question great weight. *Id.*

**Public Purpose.**

¶ 6. The public purpose doctrine applies to municipalities. *Id.* We can strike down a municipal ordinance as unconstitutional only if its unconstitutionality is established beyond a reasonable doubt. *Id.* at 129, 256 N.W.2d at 142–43. Although it is not recited in any specific clause in the Wisconsin Constitution, the public purpose doctrine is a well-established constitutional doctrine. *Millers Nat'l Ins. Co. v. City of Milwaukee*, 184 Wis. 2d 155, 174, 516 N.W.2d 376, 382 (1994).

¶ 7. A legislative body may appropriate public funds only for public purposes. *Hopper*, 79 Wis. 2d at 128, 256 N.W.2d at 142. "[T]he benefit to the public must be direct and not merely indirect or remote." *Id.* at 129, 256 N.W.2d at 143. However, due to our deference

to the decisions of a common council, we do not look underneath the reasons it has articulated. *Libertarian Party of Wisconsin v. State*, 199 Wis. 2d 790, 809, 546 N.W.2d 424, 433 (1996). As the supreme court has explained:

> Under the public purpose doctrine, we are not concerned with the wisdom, merits or practicability of the legislature's enactment. Rather we are to determine whether a public purpose can be conceived which might reasonably be deemed to justify or serve as a basis for the expenditure. A court can conclude that no public purpose exists only if it is clear and palpable that there can be no benefit to the public.

*Jackson v. Benson*, 218 Wis. 2d 835, 896, 578 N.W.2d 602, 628 (1998) (citations omitted). Encouragement of economic development and tourism and the creation of employment opportunities provide direct advantages or benefits to the public at large and therefore have been held to be public purposes. *Libertarian Party*, 199 Wis. 2d at 810, 546 N.W.2d at 434.

¶ 8. The public purpose doctrine also requires that a private corporation receiving public funds be "under reasonable regulations for control and accountability to secure public interests." *State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 216, 170 N.W.2d 790, 796 (1969). The controls required to protect the public interest in a given situation depend upon the circumstances, the purpose the legislation is intended to achieve and the parties involved. *Id.* However, as the supreme court has noted, "We should not bog down private agencies with unnecessary governmental control." *Id.* at 217, 170 N.W.2d at 797.

¶ 9. In the case before us, the Madison Common Council made the following factual findings to support its approval of the economic development grant:

> The City of Madison hereby finds that it is in the interests of the public welfare to increase the property tax base, provide employment opportunities, attract tourists and generally enhance the economic and cultural climate of the community by providing additional economic incentives for new businesses with liquor licenses.

Madison Gen. Ord. § 38.09(5)(d)1. Alexander does not dispute that increasing the property tax base, providing employment opportunities and attracting tourists are legitimate public purposes. Instead, he argues that (1) the benefits to the public are too indirect and remote to support the common council's action under the public purpose doctrine because the City has not shown that the recipients of the reserve Class B licenses would not have opened facilities serving liquor anyway, and (2) the City has not created reasonable regulations for control and accountability.

¶ 10. We first address Alexander's contention that the benefits are too indirect and remote to support the common council's action. Increasing the property tax base, providing employment opportunities and attracting tourists are all legitimate public purposes, and the City may constitutionally appropriate funds to accomplish these goals. *Libertarian Party*, 199 Wis. 2d at 810, 546 N.W.2d at 434. Here, Alexander has the burden to demonstrate that it is "clear and palpable" that no public purpose may be derived from these ordinances. *Hopper*, 79 Wis. 2d at 129, 256 N.W.2d at 143. However, he offers no support for his assertion that the same people would have applied for and received the licenses even without the ordinances. Yet, it is his burden to

provide such proof. A bald assertion such as is made here is insufficient to demonstrate that it is clear and palpable that no public purpose will be served. Therefore, we conclude that Alexander has not met his burden to provide proof on this facet of the public purpose doctrine.

■

¶ 11. Second, we address Alexander's contention that the City has violated the public purpose doctrine because the ordinances do not create reasonable regulations for control and accountability. He argues, for example, that the City's policy does not require the recipient of the grant to open the business; instead, the recipient could simply take the $10,000 check and walk away. However, Alexander's contention fails to take into account the nature of the application process. The application for the economic development grant may be submitted only at the end of a complex series of steps. The applicant must complete the application packet, appear before the Alcohol License and Review Committee and the common council and pay the $10,000 license issuance fee (as well as other fees totaling $620). He must also pass inspections by the City's health department, building inspector and fire department for the facility from which he intends to operate and pass a personal police background check. Only then will the City clerk's office begin to process the application for the economic development grant. In light of these surrounding circumstances, Alexander's contention that the grant recipient could simply pocket the grant money and walk away is far-fetched. The ordinances present sufficient controls to ensure the opening of facilities that serve liquor by the drink in the City. Therefore, we conclude that the regulations controlling the application for a reserve Class B liquor license are

inextricably tied to the application for the economic development grant and provide sufficient control and accountability to ensure that the public purposes outlined in the ordinances have a reasonable probability of being met. Accordingly, we conclude that Alexander has not met his burden to prove that the ordinances are unconstitutional beyond a reasonable doubt.

## Sham Legislation.

¶ 12. Alexander also argues that the ordinances are void because they are sham legislation created to evade the will of the legislature. To neutralize the effect of the legislative mandate that it collect a fee of at least $10,000 to issue a reserve Class B license, he argues, the City has found a backhanded way of returning the entire amount of the fee to the applicant and is doing so under false pretenses.

¶ 13. To support his "sham legislation" theory, Alexander cites *Wisconsin Tel. Co. v. City of Milwaukee*, 126 Wis. 1, 104 N.W. 1009 (1905). *Wisconsin Telephone* concerned the City of Milwaukee's attempt to use its police power to collect a fee for each telephone pole in the city under the theory that the fee was needed for supervision and inspection of the poles. However, the supreme court concluded that the city's intent was to charge a license fee for placement of the poles, authority reserved exclusively to the legislature. Because the city lacked this power, the court invalidated the ordinance that established the fee.

¶ 14. We conclude that *Wisconsin Telephone* does not prevent the City from issuing the $10,000 economic development grants at issue in this case. The statute mandating the minimum fee at issue here shows that

this is an area where the legislature required municipal action, not exclusive state action. The City has complied with the legislative requirement that it collect a fee of at least $10,000 to issue a reserve Class B liquor license by passing Madison Gen. Ord. § 38.09(5)(d). However, Wis. Stat. § 125.51(3)(e)2 does not require the City to keep the money, nor does it place any conditions on how the City may choose to spend it. Therefore, we conclude that the ordinances do not conflict with the statute.

## CONCLUSION

¶ 15. We conclude that Alexander has failed to meet his burden to demonstrate that the ordinances are unconstitutional beyond a reasonable doubt and that he has identified no Wisconsin law that supports his "sham legislation" theory. Therefore, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.